# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

ED O'GARA, Individually And On Behalf of All )
Others Similarly Situated, )
                    Plaintiff, )
    v. )
JPMORGAN CHASE & CO. & J.P. MORGAN )
SECURITIES INC., )
               Defendants. )
)

Civil Action No. **'09 CIV 6199**

**CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

RECEIVED
JUL 10 2009
U.S.D.C. S.D. N.Y.
CASHIERS

1.     Plaintiff Ed O'Gara, by his counsel, alleges the following based upon personal knowledge as to his own acts and upon the investigation by his counsel, which includes, among other things, a review of:  (a) public statements, sales presentations, and marketing materials by Defendants JPMorgan Chase & Co. ("JPMorgan Chase") and J.P. Morgan Securities Inc. ("JP Morgan") (collectively "Defendants"), and their affiliates, agents and employees; (b) Securities and Exchange Commission ("SEC") filings made by Defendants and other brokerages, financial services firms, and investment companies; (c) public filings and statements in court proceedings and civil government and regulatory investigations involving Defendants and other brokerages, financial services firms, and investment companies; (d) documents believed to be authentic copies of internal emails and other business records of various brokerages, financial services firms, and investment companies obtained from public record sources; (e) securities analysts' reports, press releases, and media reports; (f) interviews with purchasers of auction rate securities and other knowledgeable individuals; and (g) discussions with consultants.  Plaintiff believes that after reasonable opportunity for discovery, substantial evidentiary support will likely exist for the following allegations.

## INTRODUCTION

2.     Plaintiff brings this class action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of a class of investors who, between July 10, 2004 and February 13, 2008, inclusive (the "Class Period"), purchased auction rate securities for which JP Morgan served as sole auction dealer, lead auction dealer, co-lead auction dealer, or joint lead auction dealer ("JPM ARS"), and who were damaged thereby.

3.     Auction rate securities are bonds or preferred stocks that pay interest or dividends at rates set at periodic auctions.  Auction rate securities allowed issuers to obtain long-term financing at short-term interest rates, because investors reasonably expected to be able to access their principal at each periodic auction.

4.      During the Class Period and unbeknownst to investors, JP Morgan engaged in a scheme, practice or course of conduct to manipulate the market for JPM ARS to create the appearance that the securities traded at arm's-length auctions, when in fact the available supply well exceeded the demand for those securities.

5.      As part of the scheme to manipulate the market for JPM ARS, JP Morgan maintained a policy of placing or causing the placement of support bids in every auction for which it served as the sole auction dealer, lead auction dealer, co-lead auction dealer, or joint auction dealer, to the extent necessary to create the appearance of stability and liquidity in the auction market, prevent auction failures, and set the rates of interest or dividends paid on those securities.

6.      The goal of the scheme was to allow Defendants to underwrite billions of dollars of JPM ARS and to sell those securities, including Defendants' own inventory, at par value when they were worth significantly less. The scheme allowed Defendants to reap hundreds of millions of dollars in underwriting and auction dealer fees at the expense of investors who purchased JPM ARS at inflated prices.

7.      Defendants' scheme came to light on February 13, 2008, when the auction rate securities market collapsed after JP Morgan and the other major auction dealers abruptly ended their policy of propping up the market.   Since that date, the purported auctions previously managed by JP Morgan have ceased operating, and Defendants have admitted there is no prospect of the purported auctions resuming operations, as there is no demand for JPM ARS. Defendants' withdrawal of "support" for the auction market left Plaintiff and Class members holding billions of dollars in illiquid JPM ARS.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b)

and 78t(a)), and Rule 10b-5 promulgated by the Securities Exchange Commission ("SEC") (17 C.F.R. 240.10b-5).

9.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §§1391(b), 1337.  Defendants maintain offices within this District and many of the acts giving rise to the violations complained of herein took place in this District.

10.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

11.     Plaintiff Ed O'Gara, as set forth in his certification attached hereto and incorporated by reference herein, purchased JPM ARS from TD Ameritrade during the Class Period and was damaged thereby.  Plaintiff O'Gara continues to hold illiquid JPM ARS.

12.     Defendant JPMorgan Chase & Co. ("JPMorgan Chase") is incorporated in Delaware and its principal executive offices are located in New York, New York.  JPMorgan Chase & Co. is one of the world's leading financial services firms.  Through its subsidiaries, JPMorgan Chase offered investment banking, financial services, commercial banking, wealth management and advisory services.

13.     Defendant J.P. Morgan Securities Inc. ("JP Morgan") is incorporated in Delaware and its principal executive offices are located in New York, New York.  J.P. Morgan Securities Inc., a wholly-owned subsidiary of JPMorgan Chase, is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act and is a member of the Financial Industry Regulatory Authority ("FINRA").  According to JPMorgan Chase's 2008 Annual Report, "JPMorgan Chase's principal nonbank subsidiary is J.P. Morgan Securities Inc., the Firm's U.S. investment banking firm."  The 2008 Annual Report additionally states that JP Morgan is JPMorgan Chase's principal broker-dealer subsidiary in the United States.  JP Morgan

underwrote, managed auctions for, and sold auction rate securities, including JPM ARS, to Class members during the Class Period.

14.     Unless specifically noted, "Defendants" refers collectively to defendants JPMorgan Chase & Co. and J.P. Morgan Securities Inc.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all persons or entities that, between July 10, 2004 and February 13, 2008 (the "Class Period"), inclusive, purchased auction rate securities for which JP Morgan served as sole auction dealer, lead auction dealer, co-lead auction dealer, or joint lead auction dealer (the "Class"), and were damaged thereby.

16.     Excluded from the Class are Defendants; the subsidiaries and affiliates of any Defendant; any person or entity who is a partner, officer, director, employee, or controlling person of any Defendant; members of Defendants' immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any Defendant has or had a controlling interest.

17.     The members of the Class are so numerous that joinder of all members is impracticable.

18.     Prior to the collapse of the auction rate securities market, JP Morgan served as one of the largest managers of auction rate securities.  During the Class Period, investors purchased billions of dollars of auction rate securities in auctions that JP Morgan managed.

19.     While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the proposed Class who hold billions of dollars in outstanding JPM ARS.

20.     Record owners and other members of the Class may be identified from records maintained by Defendants and other brokerage firms and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether Defendants joined, directed, participated in, or otherwise engaged in a scheme to defraud purchasers of JPM ARS during the Class Period;

(c)     Whether Defendants manipulated the market for JPM ARS during the Class Period; and

(d)     Whether Class members have sustained damages and the proper measure of damages.

22.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

23.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of Plaintiff's claims. The damages suffered by individual Class members are relatively small given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class to individually redress the wrongs done to them.

25.     Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, is in fact manageable, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. The benefits of adjudicating this controversy as a class action far outweigh any difficulties in managing the Class.

26.     In the alternative, the Class may be certified under the provisions of Fed. R. Civ.

P. 23(b)(1), 23(b)(2) and/or 23(c)(4) because:

> (a)     The prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendants;

> (b)     The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests;

> (c)     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole; and

> (d)     The claims of Class members are comprised of common issues that are appropriate for certification under Rule 23(c)(4).

## FACTUAL ALLEGATIONS

**A.     Background**

**i.     Auction Rate Securities**

27.     Auction rate securities were long-term or perpetual variable-rate equity or debt instruments that paid interest or dividends at rates set at periodic "auctions."

28.     Auction rate securities were issued by closed-end preferred funds; states, state agencies, municipalities, or other governmental authorities; public or private student loan originators and lenders; and other corporations and entities.

29.     The market for auction rate securities experienced dramatic growth since the securities were first introduced in 1984. At the end of 2005, approximately $263 billion of auction rate securities were outstanding. In the subsequent 26 months, the auction rate securities market grew by nearly 25 percent. By February 2008, the market for auction rate securities exceeded $330 billion.

30.     When auction rate securities were first introduced in the mid-1980s, they were available only to highly sophisticated institutional investors with required minimum purchases of $250,000 or more. Prior to the beginning of the Class Period, issuers and underwriters lowered

the minimum investment to $25,000. The reduced minimum investment enabled sellers to market auction rate securities to retail investors including individuals, charities, and small businesses.

### ii.   The Auction Process

31.   Prior to February 2008, auction rate securities typically traded at par value through periodic "Dutch" auctions generally held every 7, 28, 35, or 49 days. The auctions determined which investors would own the securities as well as the "clearing rate," the rate of interest or dividends paid on those securities until the next periodic auction. Auction procedures typically allowed participants to submit orders to buy, sell, or hold auction rate securities.

32.   Auction rate securities allowed issuers to obtain long-term financing at less expensive, short-term rates. Auction rate securities purchasers were willing to accept short-term rates because they reasonably believed that auction rate securities could readily be disposed of at par through the periodic auctions.

33.   Issuers of auction rate securities selected and paid firms, including JP Morgan, to act as the dealer through which investors submitted orders at auctions for the issuers' securities. The firm selected to receive bids was called an "auction dealer," "broker-dealer," or "auction manager," and was said to "participate" in auctions.[1]   Investors also could place orders at auctions through other designated brokerages, often referred to as "remarketing agents" or "distributing firms," which then would transmit those orders to the auction dealer. The firm that underwrote an issuance of auction rate securities typically served as auction dealer for those securities.

34.   In a successful auction, the number of shares bid for purchase at a particular rate was equal to or greater than the number of shares offered for sale at that rate. All shares for sale were purchased, and the clearing rate, i.e., the lowest interest or dividend rate at which all sale

---

[1]   The term "auction dealer," as used in this Complaint, is intended to be synonymous with the terms, "broker-dealer" and/or "auction manager."

orders could be fulfilled, applied to all securities sold until the next auction. An auction failed if the number of shares offered for sale exceeded the number of shares bid for purchase.

35.     If the auction failed, then none of the current holders could sell their shares, as auction rate securities have no "put" feature guaranteeing that an investor can either sell the securities back to the auction dealer on demand at par value or force the issuer to redeem the securities. If an auction failed, however, the holder of an auction rate security was entitled to collect dividends or interest at a predetermined rate until the next auction. The predetermined rate of interest that was paid in the event of a failed auction was typically referred to as the "maximum rate."

36.     The maximum rate was intended to ensure that the auction rate security remained liquid if the auction failed, by attracting new buyers or prompting the issuer to refinance. If the maximum rate was insufficient to attract liquidity in the event of an auction failure, however, the risk characteristics of the auction rate security were fundamentally altered. An auction rate security that carried a low maximum rate was entirely dependent on the auction dealer's intervention and "support" for the periodic auctions to ensure liquidity, and in the absence of the auction dealer's support, any auction failure would render the security illiquid, as the maximum rate could not be counted on to attract new buyers or prompt the issuer to refinance.

**B.     Defendants Engaged In A Scheme To Defraud Purchasers Of JPM ARS**

37.     Defendants were actively involved in the auction rate securities market throughout the Class Period. JP Morgan served as an underwriter for auction rate securities and served as the sole auction dealer in "sole-managed" auctions (where only one auction dealer was signed up to participate), and as a lead auction dealer, co-lead auction dealer, or joint lead auction dealer in "multi-dealer" auctions (where multiple auction dealers were signed up to participate).

38.     During the Class Period, JP Morgan underwrote billions of dollars of auction rate securities, placing additional supply in an already saturated market. To accommodate the demands of issuers and obtain high credit ratings even as underwriting standards deteriorated

over the course of the Class Period, JPM ARS were issued with maximum rates that were capped at insufficient levels to attract liquidity in the event of an auction failure. Therefore, JP Morgan needed to suppress auction failures to prevent these low maximum rates from becoming widely known to auction rate securities investors.

39.     Throughout the Class Period, Defendants engaged in deceptive and manipulative tactics directed at auction rate securities investors to create the appearance of a functioning auction market in which auction rate securities traded in accordance with actual supply and demand. Defendants' manipulative conduct included: (1) maintaining a policy of intervening in every auction for which JP Morgan served as the sole or lead auction dealer, to the extent necessary to prevent the auction from failing, to create the appearance of stability in the auction rate securities market and to mask the inherent illiquidity of JPM ARS; (2) routinely intervening in auctions to set the rates of interest or dividends paid on those securities and deprive investors of the information necessary to assess the risk and volatility of JPM ARS; and (3) making false and misleading statements and incomplete disclosures about the liquidity of JPM ARS and JP Morgan's role in propping up the auction rate securities market.

40.     The scheme began to unravel when auction dealers allowed a discrete segment of the auction rate securities market to fail, as credit markets weakened in the summer and fall of 2007. When these auctions failed, many institutional investors began liquidating their positions in auction rate securities, and the overall deterioration in credit markets led to further selling pressure from corporate and retail holders of auction rate securities. In response, JP Morgan expanded the range and extent of its manipulative practices in an attempt to simultaneously prop up the remainder of the auction rate securities market, conceal the liquidity characteristics of JPM ARS, and protect Defendants from the consequences of their policy of intervening in the auctions.

i.     **JP Morgan Maintained A Practice Of Intervening In Every Auction For Which It Was The Sole Or Lead Auction Dealer, If Necessary To Prevent The Auction From Failing, To Create The Appearance Of Stability And Liquidity**

41.     Throughout the Class Period, JP Morgan used its own capital to place "support bids" in auctions in which it served as the sole auction dealer or as the lead auction dealer in multi-dealer auctions.   The placement of such support bids was done pursuant to a tacit understanding among JP Morgan and the issuers of JPM ARS that the auction dealer would act to prevent auction failures.

42.     Through the placement of these support bids, JP Morgan purchased JPM ARS for its own account when the auctions otherwise would have failed due to lack of sufficient demand.

43.     Until around February 13, 2008, JP Morgan followed a uniform policy of placing support bids, if needed to prevent auction failures, in every auction for which it was sole or lead auction dealer.

44.     JP Morgan was able to place support bids and prevent auctions from failing, because it was aware of the other bids in the auctions and could place its own bids after the bidding deadline for other investors.

45.     JP Morgan failed to disclose to investors that it invariably placed support bids in every auction for which it was the sole or lead auction dealer during the Class Period as necessary to prevent auction failures, that it did so pursuant to a tacit agreement with the issuer that it would suppress auction failures, and that the impact of its extensive and sustained interventions created the outward appearance that JPM ARS were readily liquid investments and that the auction market functioned by the natural interplay of supply and demand.

46.     By intervening to prevent auction failures, JP Morgan masked the liquidity risks inherent to JPM ARS. Due to the lack of transparency in the auction market, Class members had no way of knowing the extent to which JP Morgan's interventions were needed to sustain the auction rate market and ensure that auctions continued to clear.

47.    Had JP Morgan not supported these auctions, or had JP Morgan disclosed the extent of its interventions, widespread auction failures would have alerted the public to the true risk characteristics of the auction rate securities for which JP Morgan served as an auction dealer. Instead, JP Morgan's actions created a "façade of liquidity," leading purchasers of auction rate securities to believe their investments could be readily liquidated through arm's-length sales at periodic auctions.

### ii.    JP Morgan Routinely Intervened In Auctions To Set The Rates of Interest Paid On JPM ARS

48.    JP Morgan set the clearing rate for the auctions that would have failed but for its support bids throughout the Class Period. For each auction, JP Morgan knew all the bids that had been placed by both holders and prospective buyers of the securities. Armed with this information, JP Morgan placed buy bids at specified rates and in sufficient amounts that ensured the auction would clear at those rates.

49.    Throughout the Class Period, JP Morgan set interest rates in such a manner as to promote continued sales of auction rate securities to the public, but without letting clearing rates become or remain so high as to alienate the issuer clients on whom JP Morgan depended for continuing business and attendant underwriting commissions and auction dealer fees.

50.    By intervening in the auctions, JP Morgan set the clearing rate but also added JPM ARS to its own inventory. JP Morgan and its distributing firms then reduced the excess inventory between auction periods by selling JPM ARS at the clearing rate that JP Morgan had established at the previous auction.

51.    Because purchasers of income securities such as bonds and preferred stocks consider higher interest rates to be an indicator of higher risk, JP Morgan's interventions to manage interest rates and suppress auction failures deprived investors of objective information that they needed to evaluate the true risk characteristics of JPM ARS.

52.    Thus, JP Morgan's conduct in rigging the clearing rates sent a false signal about the fair price and liquidity of JPM ARS.

### iii. JP Morgan Made False And Misleading Statements And Incomplete Disclosures About Auction Rate Securities During The Class Period

53. Throughout the Class Period, JP Morgan falsely described JPM ARS and the auction rate securities market to investors, and failed to provide sufficient information to allow the investing public to understand the risks of those securities.

54. JP Morgan described JPM ARS as highly liquid, safe investments similar to money market funds, creating the perception that auction rate securities were readily liquid alternatives to cash investments.

55. Since March 2005, however, the SEC, the Financial Accounting Standards Board ("FASB"), and the "Big Four" accounting firms have adopted the position that auction rate securities do not qualify as "cash equivalents." According to the SEC, "because the auction rate securities have long-term maturity dates and there is no guarantee the holder will be able to liquidate its holdings, these securities do not meet the definition of cash equivalents in paragraphs 8 and 9 of FASB Statement No. 95, *Statement of Cash Flows*."

56. JP Morgan maintained a practice of not delivering a prospectus to its investor clients who purchased auction rate securities at periodic auctions, as it treated such purchases as "secondary market sales" exempt from the prospectus delivery requirement. JP Morgan did not provide prospectuses to investors, including Plaintiff, who purchased JPM ARS from distributing firms, or require the disclosure of any other material information to such purchasers by the distributing firm.

57. JP Morgan acknowledged in certain written disclosures that it might intervene in auctions, but suggested that it did so only sporadically. JP Morgan did not disclose the extent of its interventions, the purpose of its interventions, or the impact of its interventions on the market for JPM ARS, and the attendant risks of acquiring JPM ARS securities. JP Morgan failed to provide disclosures of any kind to investors, including Plaintiff, who purchased JPM ARS from distributing firms, even though it knew that the distributing firms would not be disclosing the facts surrounding JP Morgan's interventions in the periodic auctions for JPM ARS.

58.     Thus, during the Class Period, JP Morgan never disclosed that it maintained a policy of placing support bids as needed to suppress auction failures in every auction for which it served as sole or lead auction dealer, that these support bids masked the lack of liquidity in the market, and that the auctions would fail without these support bids.

### iv.     JP Morgan Withdraws From The Auction Rate Securities Market

59.     When the credit market deteriorated in the summer of 2007, several major auction dealers, including UBS, Merrill Lynch, Lehman Brothers, and Deutsche Bank, chose not to intervene to prevent failures of auctions for certain auction rate securities that credit markets viewed as particularly undesirable.

60.     Following these auction failures, JP Morgan continued to monitor the industry for auction failures by other auction dealers throughout the fall of 2007 and into early 2008.  JP Morgan and other auction dealers continued to support the auction rate securities market until they collectively abandoned it in February 2008.

61.     Around February 13, 2008, JP Morgan and all other major auction dealers of auction rate securities withdrew their support for the auction rate securities market.  As a result, 87% of all auctions of auction rate securities failed.

62.     At no time before then did JP Morgan notify Class members or publicly announce that it intended to withdraw its support for the JPM ARS market.

63.     As a result of the withdrawal of support by JP Morgan and other auction dealers, the auction rate securities market has permanently collapsed, rendering outstanding auction rate securities, including JPM ARS, illiquid.

### C.     Defendants Acted With Scienter

### i.     Auction Rate Securities Were Lucrative For Defendants

64.     As a significant underwriter and auction dealer of JPM ARS during the Class Period, JP Morgan earned substantial fees for its services from the issuers of those securities.

65.     To compensate JP Morgan for its underwriting services, issuers typically paid it at least 25 basis points on the face value of the securities underwritten.

66.     Pursuant to agreements with the issuers and/or auction agents, JP Morgan generally served as an auction dealer for the auction rate securities it had underwritten and was paid an annualized auction dealer fee for managing auctions.

67.     Issuers typically paid JP Morgan auction management fees of between 15 and 25 basis points per year on the amount of auction rate securities for which JP Morgan acted as an auction dealer.

ii.     **JP Morgan Took Advantage Of The Opportunity To Manipulate The Market For JPM ARS**

68.     Unlike fixed-rate bonds, commercial paper, or money market funds, auction rate securities were designed with the understanding that the holder would actively "trade" the securities by monitoring the rates of return paid on auction rate securities in relation to other short-term investment options available to the holder, and "roll at rate" (an instruction to sell unless the rate paid on the security is equal to or greater than a specified rate of interest) or sell the security outright if the rate the holder anticipates receiving on the auction rate security is inferior to other alternatives.

69.     Because purchasers of JPM ARS were not the institutional buyers who were originally intended to serve as the target buyers of auction rate securities, in the absence of active trading by holders, JPM ARS became increasingly vulnerable to intervention by JP Morgan, in its capacity as an auction dealer, to influence interest and dividend rates and create the appearance of liquidity.

70.     Before an auction took place, JP Morgan surveyed investor interest and provided guidance, known as "price talk," to potential investors about the range of rates within which it expected the auction to clear. JP Morgan controlled the "price talk" for JPM ARS auctions. If investors placed bids well above the price talk, however, JP Morgan was able to and did place sufficient bids to clear the auctions at lower interest rates.

71.     As a result of insufficient investor participation in the auctions, JP Morgan was able to and did assert control over the clearing rates and the success or failure of the auctions.

72.     As an auction dealer, JP Morgan exercised near complete control over information associated with auctions.  JP Morgan knew the number of bidders at an auction, the individual and aggregate dollar amount of bids, the range of bid prices, whether there were sufficient bids by investors for the auction to succeed, and the clearing rates in successful auctions before those rates were disclosed to the issuer and investors.  JP Morgan also knew whether it submitted bids at an auction and whether those bids were necessary for the auction's success.

73.     As an auction dealer, JP Morgan knew that the number of buyers for JPM ARS was becoming increasingly saturated and that adverse trends in the credit markets or unfavorable news about JPM ARS would result in an increase in the imbalance between sellers and buyers of JPM ARS.  Because of this imbalance, JP Morgan knew that its auctions would have failed without its intervention and other manipulative acts.

74.     JP Morgan took advantage of the opportunity to manipulate the auctions for JPM ARS and ensured that investors lacked sufficient information to determine that those auctions cleared only because of JP Morgan's interventions.

### iii.     JP Morgan Knew That JPM ARS Lacked Sufficient Maximum Rates To Ensure Liquidity In The Event Of A Failed Auction

75.     JP Morgan knew that retail investors would purchase JPM ARS only if those securities were highly rated by credit ratings agencies such as Fitch Ratings, Moody's Investor Service, and Standard & Poor's.

76.     As an underwriter, JP Morgan understood that it could obtain AAA ratings for the auction rate securities they underwrote only if those securities carried low maximum rates, as the higher the rate, the riskier the securities would be deemed to be by the agencies.  In general, JP Morgan served as an auction dealer for the auction rate securities that it underwrote.

77.     During the Class Period, JP Morgan underwrote billions of dollars in auction rate securities with maximum rates that were insufficient to ensure the liquidity of those securities in the event of a failed auction.

78.     Although JP Morgan obtained AAA ratings to provide the appearance of quality and safety of principal, it knew that those ratings actually reflected the limited liquidity of JPM ARS in the form of low maximum rates.

### iv.     JP Morgan Knew That The Market For JPM ARS Was Unsustainable

79.     When JP Morgan intervened to support an otherwise failing auction, it increased the amount of JPM ARS in its proprietary account. As a result of its frequent interventions and consequent increases in its JPM ARS holdings, it was under consistent pressure to reduce its inventory of JPM ARS.

80.     To reduce this increasing inventory of JPM ARS in 2007 and 2008, JP Morgan pressured its brokers and distributing firms to sell these securities.

81.     While some auctions failed between August 2007 and early February 2008, these failed auctions represented a small fraction of the entire auction rate securities market. These failures were not widely known to the market or investors in auction rate securities.

82.     During that time, JP Morgan engaged in an aggressive campaign to increase sales of its own inventory of JPM ARS to Class members by describing the securities as safe, highly liquid, cash-equivalent investments, without adequately disclosing the risks associated with those securities, the fact that auction dealers had allowed dozens of auctions to fail, and the likelihood that JP Morgan would abandon the auction market, leaving investors with illiquid securities.

83.     JP Morgan knew that the auction rate securities market was unsustainable. On or about February 1, 2008, JP Morgan sent a memorandum to officials for the State of California entitled "Review of 2003D General Obligation Auction Rate Securities." In this memorandum, JP Morgan privately disclosed its knowledge of: "significant" problems in the auction rate securities market dating back to June 2007; multiple failed auctions; the current "volatility" in

the auction rate securities market; and growing "concerns" regarding the ARS market. JP Morgan warned that "many ARS issuers are reviewing their current exposure and considering whether the time may be right to exit the ARS market for another mode with less volatility or risk." The memorandum further cautioned that the "State must remain vigilant going forward because of the continued possibility of failed auctions and the potential further deterioration of the general ARS market. . . ."

84.    In light of the "significant" problems in the auction rate securities market, JP Morgan sought to restructure its issuer clients' debt out of JPM ARS and into financial instruments with put features or other liquidity backstops such as variable rate debt obligations ("VRDOs"). Restructuring into VRDOs would have alleviated pressure from JP Morgan to serve as the buyer of last resort for JPM ARS and enabled JP Morgan to reduce its own exposure to those securities.

85.    In an internal email dated January 13, 2008, the head of UBS Securities' Auction Trading Desk noted that UBS, one of the other major auction managers, was considering plans to provide a line of credit to its issuer clients "for restructuring [auction rate securities] into an institutional product (VRDO)." In assessing this option, the email declares: "Our competitors are all pursing this option with their own liquidity for their own clients (Citi, BOA, RBC, JPM)."

86.    Although Defendants disclosed their concerns about the auction rate securities market to their issuer clients, they did not make similar disclosures to their investor clients.

87.    Instead, JP Morgan continued to encourage their brokers and distributing firms to sell JPM ARS through the first half of February 2008, despite increasing turmoil in the auction rate securities market, including failures of auctions conducted by Lehman Brothers, Piper Jaffray, Stifel Nicolaus, and Goldman Sachs during the last week of January 2008 and the first week of February 2008.

88.    Not only did JP Morgan ramp up its efforts to sell JPM ARS to investors when it knew the auction rate securities market was unsustainable, but it also expected to and did benefit

from the anticipated collapse of the market by: (1) restructuring certain JPM ARS that had high maximum rates and reaping substantial underwriting fees from the issuers of those securities; and (2) offering to make margin loans to its investor clients using their auction rate securities as collateral—in effect, loaning Class members back their own money at a profit.

>    v.    **That JP Morgan Acted In Concert With Other Auction Dealers To Prop Up The Market Demonstrates Its Intent To Manipulate Or Deceive**

89.    JP Morgan knew that the continued viability of the entire auction rate securities market depended upon its own conduct as well as that of the other auction dealers. JP Morgan and other auction dealers knew that if one auction dealer permitted widespread auction failures, a "run on the bank" would ensue, with panic selling by investors, and the auctions dealers being forced to choose between (a) attempting to sustain the auction rate securities market by buying all securities offered at auction and (b) allowing the auctions to fail *en masse*.

90.    As a result, JP Morgan and other auction dealers had a common interest in suppressing auction failures. In furtherance of their common interests, and with a tacit or express understanding that other auction dealers would similarly act to suppress auction failures, JP Morgan continued to intervene to prevent auction failures even after the ultimate demise of the auction rate market was widely anticipated by decision-makers at JP Morgan; JP Morgan monitored the actions of its competitors to determine if other auction dealers appeared likely to withdraw their support for the auctions; and JP Morgan communicated directly with competitors in an attempt to determine the time and circumstances under which JP Morgan's competitors were likely to withdraw their support for the market.

**D.    Plaintiff And Class Members Relied On An Assumption That JPM ARS Traded In An Efficient Market Free Of Manipulation**

91.    Plaintiff and Class members reasonably assumed that JPM ARS traded in an efficient market free of manipulation by JP Morgan.

92.    Throughout the Class Period, JPM ARS were widely held among numerous classes of investors including individuals, small businesses, charities, and large corporate and institutional holders.

93.     The very designation of JPM ARS as "auction rate" securities implied that the securities were traded on an arm's-length basis, with the auctions matching buyers with sellers and establishing a clearing rate for periodic interest or dividend payments.

94.     Auction rate securities and the auction market had existed since 1984, and had developed rapidly since that time.

95.     Throughout the Class Period and continuing until just days before the collapse of the auction rate securities market, JP Morgan and other auction dealers published research reports and presentations that touted the longevity and durability of auction rate securities.

96.     Throughout the Class Period, JP Morgan and other financial firms sold auction rate securities as cash or money market equivalents without disclosing that the market for those securities was manipulated on a systematic and pervasive basis.

97.     Through these and similar statements and sales practices made or followed until the collapse of the auction rate securities market, JP Morgan encouraged investors to believe that sufficient market demand existed to purchase the outstanding supply of JPM ARS without intervention from JP Morgan itself, that the market for JPM ARS was free of manipulation, and that any disclosures made by JP Morgan concerning its support for JPM ARS provided no basis for questioning the integrity or the fairness of the market for JPM ARS.

98.     Material news concerning auction rate securities, including JPM ARS, had a prompt and immediate effect on the market price of those securities, as evidenced by, among other things, the rapid decline in the market price of those securities immediately following the collapse of the auction market in February 2008.

E.     **Plaintiff And Class Members Suffered Damages**

99.     Plaintiff, Class members, and each of them purchased JPM ARS during the Class Period.  The JPM ARS that Plaintiff purchased during the Class Period are identified in his certification submitted herewith.  As to each of the JPM ARS purchased by Plaintiff and Class members, JP Morgan served as the sole auction dealer, lead auction dealer, co-lead auction dealer, or joint lead auction dealer.  In such capacity and with respect to each such JPM ARS

purchased by Plaintiff and Class members, JP Morgan engaged in the manipulative or deceptive devices, contrivances, schemes and artifices to defraud alleged herein, including, but not limited to, JP Morgan's interventions in auctions for the JPM ARS purchased by Plaintiff and Class members for the purpose and with the effect of masking the true value of such JPM ARS, preventing auction failures, setting the rates of interest or dividends paid on JPM ARS, and depriving Plaintiff and Class members of the information necessary to assess the risk characteristics of auction rate securities, including JPM ARS. By its actions, JP Morgan directly and proximately caused Plaintiff's and Class members' injuries.

100.    Subsequent to the collapse of the auction rate securities market, Plaintiff and Class members have been unable to sell at par the JPM ARS they purchased during the Class Period.

101.    Although federal and state securities regulators have forced JP Morgan to repurchase at par value auction rate securities that it sold to some of their investor clients, Plaintiff and Class members continue to hold illiquid JPM ARS. The JPM ARS purchased by Plaintiff and Class members are not worth the price paid for them.

102.    In its annual report to the SEC on Form 10-K for the fiscal year ended December 31, 2008, JPMorgan Chase stated that in 2008, it:  took "a $464 million charge related to the offer to repurchase auction-rate securities"; classified $2.8 billion of auction rate securities as Level 3 assets (*i.e.*, assets for which the "inputs to the valuation methodology are unobservable and significant to the fair value measurement"); and experienced "[l]osses on trading debt and equity instruments of approximately $12.8 billion, principally from mortgage-related transactions and auction-rate securities." JPMorgan Chase's recording of these losses and re-classification of auction rate securities as Level 3 assets constitute a recognition that JPM ARS purchased by Plaintiff and Class members are worth less than par value.

103.    A recently developed secondary market values illiquid JPM ARS at steep discounts to par value.  Investors who sold their JPM ARS on this secondary market have realized substantial losses.

104.    In addition, as a result of JP Morgan's manipulation of auctions and clearing rates for JPM ARS, Plaintiff and Class members have not received the interest or dividends that they were entitled to receive.

**F.    Regulators Settle Some Claims Against JP Morgan For Fraud In The Auction Rate Securities Market**

105.    JP Morgan has subject to various investigations and proceedings by state and federal securities regulators and law enforcement officials for its involvement in the auction rate securities market.

106.    The SEC first investigated JP Morgan's manipulation of the auction rate securities market in 2004.  On May 31, 2006, the SEC filed an Order Instituting Administrative And Cease-And-Desist Proceedings, Making Findings, And Imposing Remedial Sanctions And A Cease-And-Desist Order Pursuant To Section 8A Of The Securities Act Of 1933 And Section 15(b) Of The Securities Exchange Act of 1934, against JP Morgan and several other major auction rate securities broker-dealers.  (*In the Matter of Bear Stearns, et al.*, Securities Act of 1933 Release No. 8684, Securities Exchange Act of 1934 Release No. 53888, Administrative Proceeding File No. 3-12310.)

107.    The SEC found that, between January 1, 2003 and June 30, 2004, JP Morgan and other broker-dealers willfully violated Section 17(a)(2) of the Securities Act of 1933 by: intervening in auctions by bidding for their proprietary accounts or asking customers to make or change orders in order to prevent failed auctions, set a "market" rate, or prevent all-hold auctions; submitting or revising auction bids after the submission deadline; allocating securities among bidders in a manner other than that which was disclosed in the prospectus; providing higher rates of return than the clearing rate to certain investors based on express or tacit understandings with those investors; and providing different price talk to certain investors which placed those investors at an advantage in the auctions.  The SEC found that JP Morgan's unlawful conduct affected the clearing rate, and required JP Morgan to cease and desist and/or to make sufficient disclosures of these manipulative practices.

108.    In response to the SEC's May 31, 2006 Cease-And-Desist Order, JP Morgan purportedly placed a document on Defendants' website entitled, "J.P. Morgan Securities Inc. Material Auction Practices And Procedures," that described some, though not all, of the risks associated with JPM ARS.

109.    Defendants' clients would view this (incomplete) description of JP Morgan's auction rate securities practices and procedures only if they visited Defendants' website after purchasing auction rate securities and saw and clicked on the appropriate link. Defendants failed to disclose JP Morgan's auction rate securities practices and procedures at all to investors who purchased JPM ARS from distributing firms.

110.    This disclosure was incomplete and misleading in that it failed to disclose, among other things, that the degree of intervention JP Morgan needed to prevent the JPM ARS resale market from collapsing was far greater than the sporadic interventions hinted at in the disclosure; that the market for JPM ARS was under increasing stress brought on by the deteriorating credit environment; that the level of support JP Morgan needed to provide in order to prevent auction failures was increasing as its balance sheet was weakening (thereby increasing the likelihood that JP Morgan would withdraw their support for the auctions and the securities would become illiquid); that JP Morgan anticipated further weakening of demand for JPM ARS and held an increasingly negative assessment of the continued viability of the auction rate securities market; and that the suppression of material facts relating to JP Morgan's intervention in auctions resulted in the rates of interest paid on JPM ARS being inadequate to compensate investors for the risk of illiquidity or to attract liquidity in the event of failed auctions.

111.    Following the collapse of the auction rate securities market in February 2008, state and federal regulators commenced new investigations into securities fraud and related claims by auction dealers and sellers of auction rate securities including JP Morgan.

112.    On September 18, 2008, Linda Chatman Thomsen, the SEC's Director of the Division of Enforcement, testified before Congress that "broker-dealer firms that underwrote, marketed and sold auction rate securities (ARS) misled their customers." Thomsen continued:

> Through their sales forces, marketing materials, and account statements, firms misrepresented to their customers that ARS were safe, highly liquid investments that were equivalent to cash or money market funds. As a result, numerous customers invested in ARS their savings and other funds they needed to have available on a short-term basis. These firms failed to disclose the increasing risks associated with ARS, including their reduced ability to support the auctions. By engaging in this conduct, *those firms violated the Federal securities laws, including the broker-dealer antifraud provisions.* [Emphasis added.]

113.     Implicit in the SEC's investigation is that the disclosures JP Morgan made in response to the SEC's May 31, 2006 Cease-And-Desist Order were inadequate to place its own investor clients, let alone investors who purchased JPM ARS from distributing firms, on notice of the risks of investing in auction rate securities.

114.     In a letter dated August 11, 2008, the New York Attorney General alleged that JP Morgan "made misrepresentations in their marketing and sales of auction rate securities. JP Morgan . . . marketed and sold auction rate securities as safe, cash-equivalent products, when in fact they faced increasing liquidity risk." On or about August 14, 2008, JP Morgan announced that it had agreed to a settlement with securities regulators to restore liquidity to some, but far from all, of the auctions it managed.

115.     On June 2, 2009, the New York Attorney General filed an Assurance Of Discontinuance Pursuant to Executive Law § 63(5) in *In the Matter of JP Morgan Chase & Co.* The New York Attorney General found that JPMorgan Chase and JP Morgan misrepresented auction rate securities as "liquid, safe, short-term investments," and failed to adequately disclose that if an auction failed, investors would not be able to sell their auction rate securities and would be stuck holding long-term investments. The New York Attorney General further found that JP Morgan "submitted support bids, purchase orders for the entirety of an auction rate security issue for which it acted as the sole or lead broker," and that in doing so, Defendants prevented investors from "determin[ing] if auctions were clearing because or normal marketplace demand, or because JPMC was making up for lack of demand through support bids."

116.   Defendants' settlement with state securities regulators involves the repurchase of auction rate securities only from retail investors who bought the securities directly from JP Morgan.  The regulatory settlement fails to provide relief to other investors who were harmed by JP Morgan's manipulation of the auction rate securities market, including investors who purchased JPM ARS from distributing firms, and institutional and large business investors who purchased JPM ARS from JP Morgan.  These Class members either continue to hold illiquid JPM ARS, or have sold those securities at a loss.

117.   In addition, the regulatory settlement fails to compensate Class members for damages caused by the undisclosed risk of illiquidity they incurred in purchasing JPM ARS and by JP Morgan's manipulation of interest and dividend rates for JPM ARS.  The regulatory settlement also fails to account for damages caused to Class members who held JPM ARS at interest rates well below market rates, following the collapse of the market.

## NO SAFE HARBOR

118.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this complaint.

119.   The statements pleaded herein were not identified as "forward-looking statements" when made.

120.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

121.   Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by a director or an executive officer of the Defendants who knew that those statements were false when made.

## LOSS CAUSATION/ECONOMIC LOSS

122.   As alleged above, during the Class Period, Defendants engaged in a comprehensive scheme and course of conduct to create, prop up, perpetuate, and manipulate for their own benefit an artificial market for JPM ARS, to inflate the perceived value of JPM ARS, and to generate underwriting and auction dealer fees, to the detriment of Class members.

123.   This comprehensive scheme and course of conduct operated as a fraud or deceit on Class members by, among other things, sending a false pricing signal to the market for JPM ARS, and creating a false impression of the supply and demand for JPM ARS for the purpose of inflating the price of, and manipulating the interest rates for, those securities.

124.   The materialization of the risks concealed by Defendants was foreseeable to Defendants throughout the Class Period.

125.   Those risks materialized when JP Morgan and other auction dealers refused to continue serving as buyers of last resort for auction rate securities, including JPM ARS, and the auction rate securities market collapsed.

126.   Materialization of those risks and subsequent disclosures of those risks directly and/or proximately caused the damages sustained by Plaintiff and Class members.

127.   Only through the persistent conduct of JP Morgan and other auction dealers in artificially supporting, maintaining, and intervening in the auctions, acting as buyers of last resort, and setting the clearing rates was the market for JPM ARS able to exist during the Class Period.

128.   The auction rate securities market depended on the voluntary, pervasive, and ongoing participation of JP Morgan and other auction dealers in the auctions, their manipulation of interest and dividend rates, and their acquisition of auction rate securities to keep the auctions from failing.  The conduct of JP Morgan and other auction dealers created an illusory market that, unbeknownst to Plaintiff and Class members, had a high risk of failing and leaving investors with illiquid JPM ARS.

129.    During the Class Period, Defendants' senior management recognized that JP Morgan's ongoing manipulation of the auction process for JPM ARS, through the submission of purchase bids designed to prevent failed auctions or set clearing rates, created excessive risk to JP Morgan in the form of an ever-increasing inventory of JPM ARS. As a result, JP Moragn systematically sold down its own inventory of JPM ARS through an aggressive marketing campaign targeted at unsuspecting Class members.

130.    Defendants failed to disclose the purpose, nature, and effect of their manipulative conduct to Plaintiff and Class members and the investing public generally.

131.    It was materially deceptive for Defendants to signal to investors that JPM ARS traded and were priced based on the natural interplay of supply and demand.

132.    When the auctions failed, the concealed risks that JPM ARS would not trade or be priced based on the natural interplay of supply and demand materialized.

133.    Because of Defendants' manipulation of the auction rate securities market, Plaintiff and Class members were damaged when JP Morgan and other auction dealers withdrew their support for the auction market.

134.    If not for Defendants' manipulation of the market for JPM ARS, Plaintiff and Class members would not have purchased JPM ARS or would not have purchased them at the prices and/or the interest rates at which they did.

135.    As a result of the materialization of the concealed risk that Defendants were manipulating the market for JPM ARS, the true value and liquidity characteristics of JPM ARS have been revealed. JPM ARS remain illiquid and cannot be sold at par value on the open market. A recently developed secondary market values illiquid JPM ARS at steep discounts to par value. Investors who have sold their JPM ARS on this secondary market have realized substantial losses.

136.    In addition, Defendants' comprehensive, manipulative, and deceptive conduct caused the interest and dividend rates on JPM ARS both before and after the collapse of the auction market to be considerably lower than the rates that the market would have placed on

them had the investing public been aware of the true characteristics and risks of JPM ARS and the auction market.

137.    Accordingly, Defendants' wrongdoing directly or proximately caused economic losses to Class members by limiting the interest and dividends that they would have received in the absence of Defendants' manipulation.  Class members who continue to hold their JPM ARS receive interest and/or dividends on their JPM ARS at below-market rates that are insufficient to compensate for the lack of liquidity safeguards inherent in the securities.

**COUNT I**

**Violation Of Section 10(b) Of The Exchange Act
And Rule 10b-5(a) and (c) Promulgated Thereto
Against JP Morgan By Plaintiff And The Class**

138.    Plaintiff repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.  Plaintiff brings this cause of action on behalf of himself and the Class against JP Morgan under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. 240.10b-5(a), (c).

139.    During the Class Period, JP Morgan knew or recklessly disregarded that:  sellers and supply of JPM ARS outstripped buyers and demand for JPM ARS; that this imbalance in supply and demand for JPM ARS would lead to auction failures; and that to avoid auction failures, JP Morgan needed to intervene to create and perpetuate the illusion of a balanced and functioning market for JPM ARS.

140.    During the Class Period, JP Morgan employed manipulative or deceptive devices or contrivances, in contravention of Rule 10b-5(a) and (c) promulgated by the SEC, which were intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and Class members; (ii) enable JP Morgan to underwrite and serve as an auction dealer for billions of dollars of JPM ARS, and on which JP Morgan made substantial underwriting and auction dealer fees; (iii) enable JP Morgan to sustain an artificial market for JPM ARS, conceal failures of auctions for JPM ARS, and conceal imbalances in the market for JPM ARS; (iv)

enable JP Morgan to manipulate the interest rates for JPM ARS; and (v) cause Plaintiff and Class members to purchase overvalued JPM ARS.

141.   JP Morgan employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of JPM ARS, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).

142.   JP Morgan, directly and indirectly, engaged and participated in a comprehensive scheme and continuous course of conduct to manipulate the market for JPM ARS and to defraud purchasers of those securities, as specified herein.

143.   JP Morgan employed manipulative or deceptive devices or contrivances, schemes and artifices to defraud, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to deceive Plaintiff and Class members as to the value of JPM ARS by, among other things, misleading Plaintiff and Class members to believe that the prices at which they purchased JPM ARS were determined by the natural interplay of supply and demand, and were not set by JP Morgan.

144.   JP Morgan's manipulative conduct was furthered by the use, means, or instrumentalities of interstate commerce and/or the mails, including but not limited to use of the wires by JP Morgan and its personnel to plan and transmit instructions for the manipulation of auctions for JPM ARS; and transmitting to its brokers, distributing firms, and investor clients research reports, presentations, and other materials concerning JPM ARS.

145.   JP Morgan had actual knowledge of the devices, schemes, and artifices to defraud and acts, practices, and course of business which operated as a fraud and deceit upon the purchasers of JPM ARS, as set forth herein, or acted with deliberate disregard of the fraudulent or deceitful nature of said conduct.

146.   JP Morgan employed the devices, schemes, and artifices to defraud and engaged in the acts, practices, and course of business described herein, knowingly or deliberately and for the purpose and effect of (a) manipulating the market for JPM ARS, (b) concealing the truth

about the value, liquidity, and risks of JPM ARS from Plaintiff, Class members, and the investing public, and (c) supporting the inflated prices and market for JPM ARS.

147.    If JP Morgan did not have actual knowledge of the devices, schemes, and artifices to defraud and acts, practices, and course of business which operated as a fraud and deceit on the purchasers of JPM ARS, it was deliberately reckless in failing to obtain such knowledge by refraining from taking those steps necessary to discover the manipulative purpose, nature, and effect of their conduct.

148.    As a result of JP Morgan's devices, schemes, and artifices to defraud and acts, practices, and course of business, the market prices of JPM ARS failed to reflect a fair or just price of those securities and were artificially inflated during the Class Period.

149.    In ignorance of the fact that the market prices of JPM ARS were artificially inflated, and relying directly or indirectly on an assumption of an efficient market for JPM ARS free of manipulation by JP Morgan, Plaintiff and Class members acquired overvalued JPM ARS that were manipulated by JP Morgan during the Class Period, and were damaged thereby.

150.    At the time JP Morgan employed the devices, schemes, and artifices to defraud and engaged in the acts, practices, and course of business described herein, Plaintiff and Class members were ignorant of JP Morgan's conduct, and believed JPM ARS traded in an efficient market free of manipulation, at prices and with yields set by free-market influences.

151.    Had Plaintiff, Class members, and the marketplace known the truth regarding the value, liquidity, and risks of JPM ARS, including the extent to which the market for JPM ARS was sustained by JP Morgan and not determined by the natural interplay of supply and demand, Plaintiff and Class members would not have purchased JPM ARS at all or would not have done so at the prices they paid.

152.    By virtue of the foregoing, JP Morgan has violated Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c) promulgated thereunder.

153.    As a direct and proximate result of JP Morgan's wrongful conduct, Plaintiff and Class members suffered damages in connection with their purchases of JPM ARS during the Class Period.

## COUNT II

### Violation Of Section 20(a) Of The Exchange Act
### Against JPMorgan Chase By Plaintiff And The Class

154.    Plaintiff repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.  Plaintiff brings this cause of action on behalf of himself and the Class against JPMorgan Chase under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

155.    JPMorgan Chase acted as a controlling person of JP Morgan within the meaning of Section 20(a) of the Exchange Act for the reasons alleged in this Complaint.

156.    By virtue of its operational and management control of JP Morgan's business and systematic involvement in the fraudulent scheme alleged in this Complaint, JPMorgan Chase had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of JP Morgan, including the devices, schemes, and artifices to defraud and the acts, practices, and course of business, described herein, which Plaintiff contends manipulated the market for JPM ARS.

157.    JPMorgan Chase had the ability to prevent the employment of the devices, schemes, and artifices to defraud and the engagement in the acts, practices, and course of business described in this Complaint.

158.    JPMorgan Chase had direct and supervisory involvement in the operations of JP Morgan, and therefore is presumed to have had and exercised the power to control or influence the particular conduct giving rise to the securities violations alleged in this Complaint.

159.    As set forth above, JP Morgan violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder by its acts and omissions as alleged in this Complaint.

160.    By virtue of its position as a controlling person, JPMorgan Chase is liable pursuant to Section 20(a) of the Exchange Act.

161.    As a direct and proximate result of JPMorgan Chase's wrongful conduct, Plaintiff and Class members suffered damages in connection with their purchase of JPM ARS during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying Plaintiff as a representative of the Class under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as counsel for the Class;

B.    Awarding damages, including but not limited to rescission, other compensatory damages, consequential damages, restitution, and disgorgement of ill-gotten gains in favor of Plaintiff and Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding Plaintiff and the Class pre-judgment and post-judgment interest;

E.    Awarding extraordinary, equitable, and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

F.    Granting such other and further relief as the Court may deem just and proper.

_//_

_//_

_//_

_//_

_//_

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  July 10, 2009                               Respectfully submitted,

                                        By: *Stephen A. Weiss*
                                        _____
                                        Christopher A. Seeger (CS-4880)
                                        Stephen A. Weiss (SW-3520)
                                        David R. Buchanan (DB-6368)
                                        **SEEGER WEISS LLP**
                                        One William Street
                                        New York, NY 10004
                                        Telephone:  (212) 584-0700
                                        Facsimile:  (212) 584-0799

                                        Norman E. Siegel
                                        Rachel E. Schwartz
                                        **STUEVE SIEGEL HANSON LLP**
                                        460 Nichols Road, Suite 200
                                        Kansas City, MO, 64112
                                        Telephone: (816) 714-7100
                                        Facsimile: (816) 714-7101

                                        Daniel C. Girard
                                        Jonathan K. Levine (JL-8390)
                                        Aaron M. Sheanin
                                        Christina H.C. Sharp
                                        **GIRARD GIBBS LLP**
                                        601 California Street, 14th Floor
                                        San Francisco, CA 94108
                                        Telephone:  (415) 981-4800
                                        Facsimile:  (415) 981-4846

                                        Counsel for Plaintiff

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Ed O'Gara, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint against JPMorgan Chase & Co. and J.P. Morgan Securities Inc. (collectively "JP Morgan") and authorize its filing.

2.      I did not acquire any securities that are the subject of the complaint at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of a class and am willing to provide testimony at deposition or trial in the litigation, if necessary.

4.      I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.      Within the past three years, I have sought to serve as a representative party for a class in an action under the federal securities laws in the matters styled *Ciplet v. JPMorgan Chase & Co. and J.P. Morgan Securities Inc.*, 08-cv-4580 (S.D.N.Y.) (which was dismissed without prejudice) and *Bondar v. Bank of America Corporation, Banc of America Investment Services, Inc. and Banc of America Securities, LLC*, No. CV-08-2599 (JSW) (N.D.Cal.) (in which the motion is presently pending).

6.      I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

125115                                          1

7.   My purchases and sales transactions in the securities that are the subject of

the complaint during the Class Period are as follows:

| TRADE DATE | AUCTION RATE SECURITY | AMOUNT | BUY OR SELL |
|---|---|---|---|
| 01/24/2008 | Nelnet Student LNS 2003-2 A-6 | $250,000 | Bought |
| 01/24/2008 | Nelnet Student LNS 2005-4 A4AR-1FLT | $250,000 | Bought |
| 01/28/2008 | Nelnet Student LNS 2003-2 A-5 | $250,000 | Bought |
| 02/05/2008 | College Loan Corp 2007-1 A-8 FLT | $250,000 | Bought |
| 02/06/2008 | Chicago IL Midway Arpt Rev Var Amt-Second lien-Ser C | $250,000 | Bought |
| 07/31/2008 | Chicago IL Midway Arpt Rev Var Amt-Second lien-Ser C | $50,000 | Sold |

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___7th___ day of July, 2009



Ed O'Gara