USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3 31 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re JP MORGAN AUCTION RATE
SECURITIES (ARS) MARKETING
LITIGATION

10 MD 2157 (PGG)

**MEMORANDUM**
**OPINION & ORDER**

ED O'GARA, Individually and on Behalf of All
Others Similarly Situated,

Plaintiffs,

v.

JP MORGAN CHASE & CO., and,
J.P. MORGAN SECURITIES, INC.,

Defendants.

09 Civ. 6199 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Lead Plaintiff Ed O'Gara, representing a putative class of investors who

purchased auction rate securities for which JPMorgan Securities, Inc. ("JP Morgan") served as

auction dealer between July 10, 2004 and February 13, 2008, has asserted claims for (1) market

manipulation, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c); (2)

misrepresentations and omissions in violation of Section 10(b) of the Exchange Act and Rule

10b-5; and (3) violation of Section 20(a) of the Exchange Act. Defendants have moved to

dismiss all of Plaintiff's claims under Fed. R. Civ. P. 12(b)(6). Lead Plaintiff has moved for a

stay of the proceedings, including the motion to dismiss. For the reasons stated below, Lead

Plaintiff's motion to stay will be denied as moot and Defendants' motion to dismiss will be granted.

## BACKGROUND

Auction rate securities ("ARS") were designed to be long-term or perpetual variable-rate equity or debt instruments that paid interest or dividends at rates set at periodic auctions. (First Amended Cmplt. ("FAC") ¶ 27) Throughout the Class Period, auctions were conducted every 7, 28, 35, or 49 days to determine which investors would own the securities and to determine the rate of interest or dividends that would be paid on those securities until the next auction. (FAC ¶ 31) Auction procedures typically allowed participants to submit orders to buy, sell, or hold the securities. (Id.)

Issuers of ARS selected and paid financial services firms such as JP Morgan – a wholly-owned subsidiary of Defendant JP Morgan Chase & Co. (FAC ¶ 13) – to act as the dealer through which investors submitted orders at auctions for the issuers' securities, and to serve as the underwriter for the securities. (FAC ¶¶ 13, 33, 37) An auction was successful if the number of shares bid for purchase at a particular rate was equal to or greater than the number of shares offered for sale at that rate. (FAC ¶ 34) In that event, the clearing rate – i.e., the lowest interest or dividend rate at which all sale orders could be fulfilled – applied to all securities sold at that auction until the next auction. (Id.) If the auction failed, then none of the current holders could sell their shares. (FAC ¶ 35) In the event of a failed auction, the holder of the security was entitled to collect dividends or interest at a predetermined rate – known as the "maximum rate" – until the next auction. (Id.) The maximum rate was intended to ensure that the auction rate security remained liquid if the auction failed, by attracting new buyers or prompting the issuer to refinance. (FAC ¶ 36)

2

## I.    JP MORGAN'S SUPPORT BIDS

The FAC alleges that, throughout the class period, JP Morgan used its own capital

to place "support bids" in every auction in which it served as the sole auction dealer or as the

lead auction dealer in multi-dealer auctions. (FAC ¶ 41) By placing these support bids, JP

Morgan purchased ARS for its own account when the auction would otherwise have failed.

(FAC ¶ 42)

The FAC alleges that "[f]or each auction, JP Morgan knew all the bids that had

been placed by both holders and prospective buyers of the securities," enabling it to "place[] buy

bids at specified rates and in sufficient amounts that ensured the auction would clear at those

rates." (FAC ¶ 49) The FAC further alleges that JP Morgan

> failed to disclose to investors in prospectuses or otherwise that it invariably placed
> support bids in every auction for which it was the sole or lead auction dealer during the
> Class Period as necessary to prevent auction failure, that it did so pursuant to a tacit
> agreement with the issuer that it would suppress auction failures, that the impact of its
> extensive and sustained interventions created the outward appearance that JPM ARS
> were readily liquid investments, [and] that the auction market functioned by the natural
> interplay of supply and demand, [when in fact] the auctions would [have] fail[ed] absent
> its systematic placement of support bids."

(FAC ¶ 46) "By intervening to prevent auction failures, JP Morgan masked the liquidity risks

inherent to JPM ARS. Due to the lack of transparency in the auction market, Class members had

no way of knowing the extent to which JP Morgan's interventions were needed to sustain the

auction rate market and ensure that auctions would continue to clear." (FAC ¶ 47)

## II.    JP MORGAN'S SALE OF ARS INVENTORY

The FAC alleges that "JP Morgan and its distributing firms . . . reduced the excess

inventory between auction periods by selling JPM ARS at the clearing rate that JPMorgan had

established at the previous auction." (FAC ¶ 53) The FAC further alleges that "JP Morgan was

3

under consistent pressure to reduce its inventory of JPM ARS, lest it be stuck holding billions of dollars of securities that it could not sell at par value." (FAC ¶ 74) The FAC claims that during 2007 and 2008 "JP Morgan engaged in an aggressive campaign to increase sales of its own inventory of JPM ARS by causing its brokers and distributing firms to describe the securities as safe . . . investments. . . ." (FAC ¶ 75)

## III.    ALLEGED MISREPRESENTATIONS OF RISK

The FAC claims that throughout the class period JP Morgan sought to conceal the risks of ARS from investors. For example, the FAC alleges that JP Morgan "directed its brokers throughout the United States to represent to investors in written materials and uniform sales presentations that auction rate securities were highly liquid, short-term, safe investments similar to money market funds, creating the perception that auction rate securities were readily liquid alternatives to cash invesments." (FAC ¶ 57)

Lead Plaintiff claims, however, that "JP Morgan knew that the auction rate securities market was unsustainable." (FAC ¶ 96) In support of this assertion, the FAC cites to a February 1, 2008 memorandum that JP Morgan sent to the State of California, a client and issuer of JP Morgan ARS. (Id.) That memo provides, in part:

> The auction rate securities market has experienced a significant dislocation stemming from the liquidity cris[is]es since June 2007. After a period of relative recovery in September and early October, the last two months have had a decidedly different tone as credit concerns continue to grow. In the past few weeks, as we have witnessed a series of ratings downgrades to three monoline insurers, there have been failed auctions with those issuers defaulting. . . . It should be pointed out that there are a number of factors that are contributing to the volatility in the municipal ARS market:
>
> - Exposure to monoline insurers;
> - Underlying ratings on the bonds;
> - Lack of investor liquidity "put"; and
> - Seasonal balance sheet constraints.

4

As a result, many ARS issuers are reviewing their current exposure and considering whether the time may be right to exit the ARS market for another mode with less volatility or risk. . . .

While the State of California's 2003 bonds have experienced some widening over the past few months, the State is not seeing the extraordinary widening that is being felt by much of the ARS market. JP Morgan believes that the State has benefited greatly from the fact that its auction rate securities are uninsured (less than 5% of the ARS tax-exempt market is uninsured). In effect, the lack of insurance has allowed the State to sidestep most of the current deterioration that has impacted the insured auction rate market. Although the State finds itself in a favorable position relative to some other ARS issuers, the State must remain vigilant going forward because of the continued possibility of failed auctions and the potential further deterioration of the general ARS market. . . .

With these thoughts in mind, JPMorgan recommends that the State continue in the ARS mode on its 2003D bonds for the time being, but review its exposure over the next three weeks as two additional series (Series D-2 and D-3) reset for an additional 35 days. This review should take into consideration where the auction rate securities reset relative to their historical performance, as well as in relation to the SIFMA index over similar timeframes. Should further ARS market deterioration continue over this period, or should the State's ARS widen substantially or suffer from a failed auction, the State will have ample time to consider possible alternatives to staying in the ARS mode. . . .

In closing, should the State's auction rate securities remain relatively impervious to the shake-up tak[ing] place in the ARS market, we believe the prudent course of action is for the State to stay the course and monitor how its ARS continue to trade, both on a historical and relative basis. Should conditions change, JP Morgan is available and stands ready to assist the State in developing a financing plan to address additional widening of its 2003D spreads and/ or a continued deterioration of the auction rate market. . . .[1]

---

[1] In determining the sufficiency of a complaint for purposes of Rule 12(b)(6), this Court's consideration is limited to "the factual allegations in plaintiffs' . . . complaint, . . . to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." Brass v. Am. Film Techs., Inc. , 987 F.2d 142, 150 (2d Cir. 1993)); see also Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (documents may be considered when they are "integral" to the complaint); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991) (court may rely on documents affixed to movant's papers in motion to dismiss if "plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint . . .").

While the Second Circuit has cautioned that "[l]imited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents,

(Schwartz Decl., Ex. 1, at 1-3)

## IV.   COLLAPSE OF THE ARS MARKET

In the summer of 2007, several major auction dealers – not including JP Morgan –

"chose not to intervene to prevent failures of auctions for certain auction rate securities." (FAC ¶

63)  After these failed auctions, there was "increasing turmoil in the auction rate securities

market," with the result that "JP Morgan was forced to increase its number of support bids to fill

the increasing gap in the demand for auction rate securities." (FAC ¶ 64)  As a result of this

increase in support bids, "JP Morgan's internal auction rate securities inventory reached

unprecedented levels." (FAC ¶ 74)  The FAC alleges that "[t]o reduce this increasing inventory

of JPM ARS in 2007 and 2008, JP Morgan pressured its brokers and distributing firms to sell

these securities," and

> engaged in an aggressive campaign to increase sales of its own inventory of JPM ARS by
> causing its brokers and distributing firms to describe the securities as safe, highly liquid,
> cash-equivalent investments, without adequately disclosing the risks associated with
> those securities, the fact that auction dealers had allowed dozens of auctions to fail, and
> the likelihood that JP Morgan would abandon the auction market, leaving investors with
> billions of dollars of securities that could not be sold at par value.

(FAC ¶ 75)

On or about February 13, 2008, "JP Morgan and all other major auction dealers of

auction rate securities withdrew their support for the auction rate securities market. As a result,

87% of all auctions of auction rate securities failed." (FAC ¶ 66)  The FAC further alleges that

JP Morgan did not notify Class members, prior to February 13, 2008, of its intention to withdraw

---

wholesale, into the complaint," Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004), in this case the
FAC relies on (1) the February 1, 2008 JP Morgan memorandum to the State of California; and
(2) the substance of JPMorgan's disclosures to investors, both in its prospectuses and, beginning
in 2006, on its website. (FAC ¶¶ 59-62, 96, 130-32)  Accordingly, these documents will be
considered in resolving the motion to dismiss.

6

its support for the JP Morgan ARS market. (FAC ¶ 67) Plaintiff alleges that, "[a]s a result of the withdrawal of support by JP Morgan and other auction dealers, the auction rate securities market has permanently collapsed, rendering outstanding auction rate securities, including JPM ARS, unsaleable at par." (FAC ¶ 68)

## V.    JP MORGAN'S DISCLOSURES

The FAC alleges that JP Morgan followed "a practice of not delivering a prospectus to its investor clients who purchased auction rate securities at period auctions," but that "[t]he prospectuses for JPM ARS were false and misleading in any event." (FAC ¶ 60) According to the FAC, "[t]he prospectuses failed to disclose that JP Morgan maintained a policy of systematically intervening to prevent all auctions from failing." (FAC ¶ 61) Instead, according to the FAC, the prospectuses indicated that "JP Morgan 'might' or 'may' intervene in auctions, suggesting that it did so sporadically at most." (Id.)

According to the FAC, the Securities and Exchange Commission conducted an investigation of JP Morgan's practices with respect to ARS beginning in 2004. (FAC ¶ 126) On May 31, 2006, the SEC filed an Order Instituting Administrative and Cease-And-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions against JP Morgan and other broker-dealers. (Id.) The SEC found that between January 1, 2003, and June 30, 2004, JP Morgan and other broker-dealers had willfully violated Section 17(a)(2) of the Securities Act of 1933 by, inter alia, "intervening in auctions by bidding for their proprietary accounts or asking customers to make or change orders in order to prevent failed auctions." (FAC ¶ 127) The SEC found that JP Morgan's unlawful conduct had "affected the clearing rate, and [the Commission] required JP Morgan to cease and desist and/or to make sufficient disclosures of these manipulative practices." (FAC ¶ 128)

In response to the SEC's cease-and-desist order, JP Morgan placed a disclosure

document on its website. This document – dated August 15, 2006 – is entitled, "Tax Exempt

Capital Markets – J.P. Morgan Securities Inc. Material Auction Practices and Procedures," and

states in part:

> JPMorgan is permitted, but not obligated, to submit orders in Auctions for its own account either as a bidder or seller, and routinely does so in its sole discretion. If JP Morgan does so, it would likely have an advantage over other bidders because it would have knowledge of some or all of the other orders placed through it in that auction and, thus, could determine the rate and size of its order so as to ensure that its order is likely to be accepted in the auction and that the Auction is likely to clear at a particular rate. . . .
>
> JP Morgan may place one or more bids in an Auction for its own account to acquire securities for its own account, to prevent an Auction in which the auction agent does not receive sufficient orders at or below a specified "maximum interest rate" to purchase all the securities being sold (a "Failed Auction") (which would result in the Auction Rate being set at a "Maximum Interest Rate"), or to prevent an Auction from clearing at a rate that JP Morgan believes does not reflect the market for the securities. . . . JP Morgan may also encourage bidding by others in Auctions, including to prevent a failed auction or to prevent an Auction from clearing at a rate that JP Morgan believes does not reflect the market for the securities. . . . JP Morgan routinely places such bids, or encourages others to bid, in Auctions.
>
> Bids by JP Morgan or by those it may encourage to place bids are likely to affect (i) the auction rate for a particular Auction, including preventing that rate from being set at the Maximum Interest Rate for a particular Auction or otherwise causing bidders to receive a higher or lower rate than they might have received had JP Morgan not bid or encouraged others to bid, and (ii) the allocation of the securities being auctioned, including displacing some bidders who may have their bids rejected or receive fewer securities than they would have received if JP Morgan had not bid or encouraged others to bid. Because of these practices, the fact that an Auction clears successfully does not mean that an investment in these securities involves no significant liquidity or credit risk. JP Morgan is not obligated to continue to place such bids or encourage other bidders to do so in any particular Auction to prevent an Auction from failing or clearing at a rate that JP Morgan believes does not reflect the market for the securities. Customers should not assume that JP Morgan will do so or that Failed Auctions will not occur. . . .

(Youngwood Decl., Ex. A, at 2-3)  Plaintiff purchased the ARS at issue in this case between

January 24, 2008, and February 6, 2008 (Youngwood Decl., Ex. F), long after JP Morgan had

posted this disclosure on its website.

The prospectuses for the ARS products purchased by Lead Plaintiff contained

similar disclosures with respect to the role of the broker-dealer at auctions. For example, the

prospectus for the College Loan Corporate Trust II ARS product purchased by Plaintiff provides

that

> [e]ach broker-dealer is permitted, but not obligated, to submit orders in auctions for its own account either as a bidder or seller and routinely does so in the auction rate securities market in its sole discretion. If a broker-dealer submits an order for its own account, it would have an advantage over other bidders because such broker-dealer would have knowledge of the other orders placed through it in that auction and, thus, could determine the rate and size of its order so as to increase the likelihood that its order will be accepted in the auction and that the auction will clear at a particular rateis likely to clear at a particular rate. . . .
>
> Each broker-dealer may routinely place one or more bids in an auction for its own account to acquire auction rate notes for its inventory, to prevent an "auction failure event" (i.e. an event where there are insufficient clearing bids, which would result in the auction rate being set at the maximum rate) or to prevent an auction from clearing at a rate that such broker-dealer believes does not reflect the market for the auction rate notes . . . .
>
> Each broker-dealer routinely encourages bidding by others in auctions for which it serves as broker-dealer. Each broker dealer also may encourage bidding by others in auctions, including to prevent an "auction failure event" or to prevent the auction from clearing at a rate that the broker-dealer believes does not reflect the market for the auction rate notes . . . .
>
> Bids by a broker-dealer are likely to affect (i) the auction rate – including preventing the auction rate from being set at the maximum rate or otherwise causing bidders to receive a higher or lower rate than they might have received had such broker-dealer not bid or encourage others to bid and (ii) the allocation of auction rate notes being auctioned – including displacing some bidders who may have their bids rejected or receive fewer auction rate notes than they would have received if such broker-dealer had not bid or encouraged others to bid. Because of these practices, the fact that an auction clears successfully does not mean that an investment in the auction rate notes involves no significant liquidity or credit risk. The broker-dealers are not obligated to continue to place such bids in any particular auction to prevent an auction from failing or clearing at a rate a broker-dealer believes does not reflect the market for the auction rate notes. Investors should not assume that the broker dealers will do so or that "auction failure events" will not occur. . . .

9

Existing holders may sell, transfer or dispose of auction rate notes in an auction only pursuant to a bid or sell order in accordance with the auction procedures or outside of an auction only through a broker-dealer. Existing holders will be able to sell all of the auction rate notes that are the subject of submitted sell orders only if there are bidders willing to purchase all those auction rate notes in the auction. If sufficient clearing bids have not been made, existing holders that have submitted sell orders will not be able to sell in the auction all, and may not be able to sell any, of the auction rate notes subject to such submitted sell orders. As discussed above (see "Risk Factors – Bidding by broker-dealers"), a broker-dealer may submit a bid in an auction to keep it from failing, but it is not obligated to do so. There may not always be enough bidders to prevent an auction from failing in the absence of such broker-dealer bidding in the auction for its own account. Therefore, "auction failure events" are possible, especially if the issuing entity's credit were to deteriorate, a market disruption were to occur or if, for any reason, a broker-dealer were unable or unwilling to bid in the applicable auction. . . .

(Youngwood Decl., Ex. E, S-21–S-24; see also Youngwood Decl., Ex. D at S-18-S-19, 11)

## DISCUSSION

## I.   PLAINTIFF'S MOTION TO STAY AND THE WILSON DECISION

Lead Plaintiff moved to stay consideration of Defendants' motion to dismiss pending resolution of the appeal in In re Merrill Lynch Auction Rate Sec. Litig., Dkt. No. 10-1528 (2d Cir.) The District Court had granted the broker-dealer's motion to dismiss in that action, which involves allegations very similar to those raised here. In that case, plaintiff argued that Merrill Lynch's disclosure that it "may routinely" place bids to prevent failed auctions did not sufficiently apprise him of, inter alia, the fact that Merrill Lynch placed bids for its own account at every auction and that these auctions would have failed absent Merrill Lynch's support bids.[2] Wilson v. Merrill Lynch & Co., 10-cv-1528, 2011 WL 5515958 (2d Cir. Nov. 14, 2011).

---

[2] In the Merrill Lynch action (captioned Wilson v. Merrill Lynch & Co, Inc. in the Second Circuit), plaintiff alleged:

"First, Merrill did not periodically or even "routinely" submit support to prevent individual auctions from failing. Instead, it did so as a matter of course in every single auction in which

10

In seeking a stay, Lead Plaintiff argued that "[a] stay of proceedings [in O'Gara is]

warranted because a decision by [the Second Circuit] may be dispositive of the issues raised in

the Defendants' pending motion to dismiss. . . ." (Pltf. Mot. to Stay at 1) Lead Plaintiff further

noted that the "claims and allegations in the [FAC] are nearly identical to the claims that are

currently on appeal before the Second Circuit." (Id. at 7)

The Second Circuit, however, affirmed the district court's determination that the

broker-dealer's disclosures precluded the investor's manipulation claim under Section 10(b) of

the Securities Exchange Act:

> . . . we find no error in the district court's conclusion that Merrill's disclosures of its
> support bidding practices sufficed to preclude Wilson's claim that these practices were
> manipulative.

it was the sole or lead auction dealer under a tacit or express understanding with the issuers
of [Merrill] ARS that Merrill would systematically support the auction rate securities market.
Second, Merrill knew with certainty that there was insufficient investor demand, and that the
market would fail unless it placed support bids. Third, Merrill bid not out of a desire to
increase its own inventory, but rather to create a false impression of demand. Fourth,
Merrill's bids were not designed to "reflect the market" for [Merrill] ARS, but to sustain it, as
Merrill increased interest rates to attract buyers, in a desperate attempt to keep the market
afloat for as long as possible."

Wilson v. Merrill Lynch & Co., 10-cv-1528, 2011 WL 5515958, at *9 (2d Cir. Nov. 14, 2011)
(quoting Plaintiff's Br. at 28-29)

Here, Lead Plaintiff alleges that JP Morgan:

> failed to disclose to investors in prospectuses or otherwise that it invariably placed support
> bids in every auction for which it was the sole or lead auction dealer during the Class Period
> as necessary to prevent auction failure, that it did so pursuant to a tacit agreement with the
> issuer that it would suppress auction failures, that the impact of its extensive and sustained
> interventions created the outward appearance that JPM ARS were readily liquid investments,
> [and] that the auction market functioned by the natural interplay of supply and demand,
> [when in fact] the auctions would [have] fail[ed] absent its systematic placement of support
> bids.

(FAC ¶ 46)

11

As an initial matter, there can be no dispute that the general phenomenon of ARS dealers placing bids to prevent failed auctions (i.e., "support bidding") was publicly disclosed by the time that Wilson purchased his ARS in July 2007. The 2006 SEC Order, for example, noted that certain ARS dealers had "submitted bids to ensure that all of the securities would be purchased to avoid failed auctions and thereby, in certain instances, affected the clearing rate." The Order faulted the dealers for inadequate disclosures of their bidding practices, but made clear that dealers were permitted to bid for their own accounts as long as that bidding was properly disclosed.

Pursuant to the 2006 SEC Order, Merrill posted on its website a document disclosing its then-current auction bidding practices. As noted above, this document included the disclosures that (1) Merrill "is permitted, but not obligated, to submit orders in auctions for its own account"; (2) Merrill "routinely" places such orders "in its sole discretion"; (3) Merrill "may routinely place one or more bids in an auction for its own account" for several purposes, including to "prevent an auction failure"; (4) due to the possibility that Merrill would place such bids for this purpose, "the fact that an auction clears successfully does not mean that an investment in the securities involves no significant liquidity or credit risk"; and (5) "in the absence of Merrill ... bidding in the auction for its own account or encouraging others to bid," there might not be sufficient demand to prevent auction failure. Id. at 102–05. These disclosures revealed, at the very least, the possibility that Merrill would place support bids in some auctions that it managed and that in the absence of these bids, some of these auctions might fail.

Wilson, 2011 WL 5515958, at *9-*10 (citations omitted).

In light of the Second Circuit's issuance of the Wilson decision, Plaintiff's motion

for a stay will be denied as moot. The Second Circuit's reasoning in Wilson is directly

applicable here, however, given the similarity in allegations.

## II.   MOTION TO DISMISS

### A.   Legal Standard

"To survive a motion to dismiss, a claim must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129

S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In

considering a motion to dismiss . . . the court is to accept as true all facts alleged in the

complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing

Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)),
and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v.
Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled if it merely "offers 'labels and conclusions' or 'a
formulaic recitation of the elements of a cause of action.'" Iqbal, 129 S. Ct. at 1949 (quoting
Twombly, 550 U.S. at 555), or if it does not provide factual allegations sufficient "to give the
defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock &
Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550
U.S. at 555).

A plaintiff alleging securities fraud and related causes of action must meet a
heightened pleading standard in order to survive a defendant's motion to dismiss. The Private
Securities Litigation Reform Act (PSLRA) – which was enacted "[a]s a check against abusive
litigation by private parties," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313
(2007) – requires a plaintiff who alleges securities fraud based on a misrepresentation or
omission of material fact to "specify each statement alleged to have been misleading, [and] the
reason or reasons why the statement is misleading. . . ." 15 U.S.C. § 78u–4(b)(1). The PSLRA
also requires that in any securities fraud action "the complaint shall, with respect to each act or
omission alleged to violate [the Securities Exchange Act], state with particularity facts giving
rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §
78u–4(b)(2).

In addition to the pleading requirements of the PSLRA, Fed. R. Civ. P. 9(b)
applies to any claim sounding in fraud. Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004).
Rule 9(b) provides that "[i]n alleging fraud ... a party must state with particularity the

circumstances constituting fraud." The Second Circuit "has read Rule 9(b) to require that a complaint '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Rombach, 355 F.3d at 170.

### B.     Elements of Plaintiff's Claims

To state a claim for market manipulation, a plaintiff must allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." ATSI Commc'ns, Inc. v. Sharr Fund, Ltd., 493 F.3d 87, 101 (2d Cir. 2007).

To state a securities fraud claim under Section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission, (2) scienter, . . . (3) a connection with the purchase or sale of a security, (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation'; (5) economic loss, and (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss." Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005) (internal citations omitted).

As discussed below, this Court concludes that the allegations in the FAC do not support a finding of scienter. In addition, Lead Plaintiff has not adequately pled "manipulative acts" in connection with his market manipulation claim, or "a material misstatement or omission" in connection with his claim for fraud under Section 10(b) and Rule 10b-5. Accordingly, Defendants' motion to dismiss will be granted.

14

## C.    **Plaintiff Has Not Adequately Pled Scienter**

Defendants argue that the FAC does not adequately plead scienter as to either the

market manipulation claim or the misrepresentation and omission claim. The PSLRA requires

that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant

acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "The requisite state of mind is

an 'intent to deceive, manipulate, or defraud.'" Defer LP v. Raymond James Financial, Inc., No.

08 Civ. 3449 (LAK), 2010 WL 3452387, at *4 (S.D.N.Y. Sept. 2, 2010) (quoting Cherry Street,

LLC v. Hennessee Group LLC, 573 F.3d 98, 108 (2d Cir. 2009)). An inference of scienter is

sufficiently strong if, based on the facts alleged, "a reasonable person would deem [it] cogent

and at least as compelling as any opposing inference one could draw from the facts alleged."

Tellabs, 551 U.S. at 324. Allegations of scienter must be substantiated by specific facts and may

not be pled in general terms: "[a]llegations that are conclusory or unsupported by factual

assertions are insufficient." ATSI Commc'ns, 493 F.3d at 99.

"The plaintiff may satisfy this requirement by alleging facts (1) showing that the

defendants had both motive and opportunity to commit the fraud or (2) constituting strong

circumstantial evidence of conscious misbehavior or recklessness." Id. Plaintiffs must plead

scienter in connection with both market manipulation claims and claims for securities fraud

under Section 10(b) and Rule 10b-5. Id. at 102, 99. Indeed, "[t]his pleading requirement is

particularly important in manipulation claims because in some cases scienter is the only factor

that distinguishes legitimate trading from improper manipulation." Id. at 102. Here, Lead

Plaintiff claims that the FAC establishes both that Defendants had motive and opportunity to

commit fraud, and that the FAC's allegations constitute strong circumstantial evidence of

conscious misbehavior or recklessness.

15

## 1.    **Motive and Opportunity**

"The type of motive required to plead scienter 'entail[s] concrete benefits that

could be realized by one or more of the false statements and wrongful nondisclosures alleged.'"

Vining v. Oppenheimer Holdings, Inc., No. 08 Civ. 4435 (LAP), 2010 WL 3825722, at *6

(S.D.N.Y. Sept. 29, 2010) (quoting Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000)).  The

FAC alleges that JP Morgan – as the auction dealer for the auctions in which Lead Plaintiff

purchased ARS – "earned substantial fees for its services from the issuers of those securities,"

and that "[i]ssuers typically paid JP Morgan auction management fees of between 15 and 25

basis points per year on the amount of auction rate securities for which JP Morgan acted as an

auction dealer."  (FAC ¶¶ 69,72) [3]

The fact that JP Morgan earned fees in connection with the sale of ARS is

insufficient to establish its motive to commit fraud.  See Steed Finance LDC v. Laser Advisers,

---

[3] Defendants argue that Lead Plaintiff's claims fail because he has not pled facts demonstrating
that someone whose intent could be imputed to the corporation acted with the requisite scienter.
(Def. Br. at 19-20)  In order to plead scienter, a plaintiff must present factual allegations that
"create a strong inference that someone whose intent could be imputed to the corporation acted
with the requisite scienter."  It is, however, "possible to raise the required inference with regard
to a corporate defendant without doing so with regard to a specific individual defendant."
Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc., 531 F.3d 190, 195 (2d
Cir. 2008).  For example, if a plaintiff could demonstrate that an announcement made on behalf
of a corporation "'would have been approved by corporate officials sufficiently knowledgeable
about the company to know that the announcement was false,'" an inference of scienter would be
possible even if no individual defendant were named.  Id. at 196 (quoting Makor Issues & Rights
v. Tellabs Inc., 513 F.3d 702, 708 (7th Cir. 2008)).

Here, Lead Plaintiff alleges that JP Morgan "underwrote billions of dollars of auction rate
securities" and that, throughout the class period, it "followed a uniform policy of placing support
bids, if needed to prevent auction failures, in every auction for which it was the sole or lead
auction dealer."  (FAC ¶¶ 38, 43)  If non-disclosure of this practice is fraudulent, Plaintiff's
allegations suggest that the practice was widespread enough that it would have been approved by
someone with sufficient knowledge of its fraudulent nature.  Moreover, Plaintiff has based his
scienter allegations partly on a memorandum authored by named JP Morgan personnel.
Accordingly, the Court finds that Plaintiff's failure to impute scienter to specific JP Morgan
employees is not fatal to his claims.

16

Inc., 258 F. Supp. 2d 272, 278 (S.D.N.Y. 2003) (promise of higher fees, without more, "cannot provide the requisite motive" for fraud under the PSLRA); Edison Fund v. Cogent Inv. Strategies Fund, Ltd., 551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008) ("To accept a generalized allegation of motive based on a desire to continue to obtain management fees would read the scienter requirement out of the statute."); see also Novak, 216 F.3d at 307 (plaintiffs cannot allege scienter "based on motives possessed by virtually all corporate insiders, including (1) the desire to maintain a high corporate credit rating . . . and (2) the desire to maintain a high stock price in order to increase executive compensation. . . ."). Indeed, courts considering securities fraud claims based on the placement of support bids in ARS auctions to prevent failed auctions have ruled that the auction dealer's receipt of fees is inadequate to create an inference of motive. See In re Citigroup Auction Rate Sec. Litig., 700 F. Supp. 2d 294, 305 (S.D.N.Y. 2009) ("Plaintiff's conclusory allegations regarding Defendants' motive for the alleged manipulation focus principally on Defendants' desire to sell Citigroup ARS to offset subprime market losses and to obtain fees for services in connection with the auctions; they are insufficient to give rise to a strong inference of scienter."); see also Vining, 2010 WL 3825722, at *7 (S.D.N.Y. Sept. 29, 2010) (quoting Kalnit v. Eichler, 264 F.3d 131, 140 (2d Cir. 2001)) ("[defendant broker-dealer's] profit motive in perpetuating the ARS market in order to maintain relationships with auction dealers and grow its underwriting business is 'a generalized motive . . . not sufficiently concrete for purposes of inferring scienter'").

Lead Plaintiff also argues that JP Morgan "was motivated to conceal the weakness in the ARS market to allow [it] sufficient time to reduce its own internal inventory of JPM ARS," and that the facts pleaded in the FAC establish that "JP Morgan boosted its inventory sales not to fulfill a routine business objective, but to reduce its own exposure while knowing –

17

and not disclosing to buyers – that it could not keep the scheme going much longer." (Pltf. Br. at 29-30)

In support of this claim, the FAC alleges that "between August 2007 and February 2008, JP Morgan and its distributing firms sold millions of dollars of the Chicago Illinois Midway Airport security to investors in the days following auctions in which JP Morgan's support bids prevented auction failure."[4] (FAC ¶ 54) Lead Plaintiff also cites JP Morgan's February 1, 2008 memorandum to the State of California – a JP Morgan client and ARS issuer – expressing concern about the ARS market. (Schwartz Decl., Ex. 1, at 1-3)

Lead Plaintiff further notes that courts have found scienter to be adequately pled where the allegations in a complaint demonstrate that defendants anticipated the coming illiquidity of the ARS market and attempted to sell their ARS inventory before these securities became illiquid. See Pltf. Br. at 28-29 (citing Defer, 2010 WL 3452387, at *5; Dow Corning Corp. v. BB & T Corp., No. 09–5637 (FSH)(PS), 2010 WL 4860354, at *10 (D.N.J. Nov. 23, 2010). In both of these cases, however, plaintiffs pled facts supporting their claims that the defendants – perceiving the rising liquidity risks of ARS – made a decision to eliminate or dramatically reduce their own inventory of ARS. The facts pleaded here do not support such a theory.

In Defer, plaintiffs alleged that the defendant broker-dealer

was motivated to commit the alleged fraud in order to "unload" its inventory of ARS, reducing its exposure to soon-to-be-illiquid securities. They rel[ied] on allegations that

---

[4] The FAC contains a chart listing JP Morgan and its distributing firms' sales of the Chicago Illinois Midway Airport security between August 4, 2007 and February 14, 2008. (FAC ¶ 54) The chart sets forth eighteen sales periods between these dates. The chart demonstrates that the amount of ARS inventory JPMorgan sold during this time period fluctuated wildly, from $50,000 for the sales period January 26-31, 2008, to $32,725,000 for the sales period September 22-27, 2007. There is no consistent pattern. (FAC ¶ 54)

18

(1) the ARS market deteriorated between August 2007 and February 2008, (2) [defendant's] employees sent three emails in November and December 2007 to financial advisors allegedly indicating that [defendant] had a large inventory of ARS and offering incentives to sell them, and (3) [defendant] needed to sell ARS in late 2007 to comply with its internal risk limits.

Defer, 2010 WL 3452387, at *5 (citations omitted). Citing these factual allegations, the Defer court concluded that "[g]iven the deterioration of the ARS market that began in August 2007 and [the defendant's] wish to reduce its own position from November 2007 forward, it is quite reasonable to infer that [the defendant] then had a motive to conceal the ARS illiquidity risk from customers to whom it hoped to sell ARS from its own portfolio." Id.

The class period alleged in Defer ran from April 8, 2003 to February 13, 2008, however (id. at *1), and the court found that for the period between April 2003 and November 2007 – a period during which the plaintiffs merely pled that "the ARS market deteriorated" – the plaintiffs had not adequately alleged scienter. Id. at *5. The court reasoned that the defendant "could not have been motivated between April 2003 and November 2007 by a desire to unload its own ARS inventory, if indeed it had one during that period, before coming to the conclusion [in November 2007] that its inventory should be reduced or sold entirely." Id. Accordingly, the court concluded that plaintiffs had adequately pled scienter only for the post-November 2007 time period, during which the plaintiffs had allegedly adopted a new policy of disposing of ARS inventory. Id.

Similarly, in Dow Corning, the complaint pled "that defendants (1) knew that the ARS market would be illiquid without intervention by brokers beginning in Fall 2007 and (2) held large inventories of ARS, which they needed to sell. . . ." Dow Corning Corp., 2010 WL 4860354, at *10. The court applied the reasoning of Defer to find that, because the defendants

19

were engaged in a campaign to dispose of their ARS inventory, it was reasonable to infer that they were motivated to conceal its liquidity risks from investors. Id.

Here, by contrast, Plaintiff has not pled facts demonstrating that JP Morgan reached a conclusion – in the fall of 2007 or at any other point -- that it needed to "unload" its ARS inventory in order to reduce its exposure to rising liquidity risks. Plaintiff alleges that JP Morgan "reduced [its] excess inventory [of ARS] between auction periods by selling JPM ARS at the clearing rate that JP Morgan had established at the previous auction." (FAC ¶ 53) But because JPMorgan also purchased ARS at each auction through its placement of "support bids," its sale of ARS in the intervening periods does not point to the conclusion that JPMorgan ever decided that "its inventory should be reduced or sold entirely," Defer, 2010 WL 3452387, at *5, and the FAC does not allege that that was the case. Indeed, the data presented by Plaintiff does not support its theory that JP Morgan – at any point after the auctions began to fail in the fall of 2007 – had decided to pursue a concerted policy of unloading its ARS inventory. The data demonstrate that JPMorgan sold ARS at every inter-auction interval during this period, but that the amount of its sales fluctuated wildly, and did not rise consistently. Indeed, six of the seven sale periods between December 15, 2007 and February 14, 2008 reflect very modest sales of ARS. (FAC ¶ 54)

Lead Plaintiff's theory that JP Morgan reached a decision in 2007 and 2008 to "unload" its ARS inventory – leading it to embark on "an aggressive campaign" of "pressur[ing] its brokers and distributing firms to sell these securities" (FAC ¶ 75) – also contradicts the FAC's assertion that, throughout the Class Period (July 10, 2004 to February 13, 2008, FAC, ¶ 2), "JP Morgan was under consistent pressure to reduce its inventory of JPM ARS" as a result of its policy of placing support bids to prevent failed auctions. (FAC ¶ 74 (emphasis added); see

20

also FAC ¶ 39 ("Throughout the Class Period, Defendants engaged in deceptive and manipulative tactics to create the appearance of a functioning auction market . . . [including] maintaining a policy of intervening in every auction for which JP Morgan served as sole or lead auction dealer, to the extent necessary to prevent the auction from failing. . . .")

In sum, unlike the complaint in Defer, the FAC does not plead facts demonstrating that JPMorgan ever reached a conclusion that it needed to reduce or eliminate its ARS inventory: the FAC merely alleges that JPMorgan engaged in a consistent practice, throughout the Class Period, of purchasing ARS via "support bids" and selling excess ARS inventory during the inter-auction intervals. These allegations demonstrate that JP Morgan sought to manage its ARS inventory – rather than accumulating all the ARS that it purchased through support bids – but do not establish that JP Morgan at any point pursued a policy of reducing or eliminating its ARS inventory.

The FAC is thus not distinguishable from complaints discussed in other cases in which courts have found scienter to be inadequately pled. See Ashland Inc. v. Morgan Stanley & Co., Inc., 700 F. Supp. 2d 453, 468 (S.D.N.Y. 2010) (complaint's "failure to allege facts showing that [the defendant] hoped to induce [the plaintiff] to purchase [ARS] in the auctions to increase or sustain demand for [ARS] so that [the defendant] could sell off its own [ARS] holdings is fatal the [complaint]"); In re Citigroup Auction Rate Sec. Litig., 700 F. Supp. 2d at 305.

JP Morgan's February 1, 2008 memorandum to the State of California likewise does not demonstrate that it acted with scienter. As an initial matter, the memorandum is dated only twelve days before the close of the Class Period. (FAC ¶ 15; Schwartz Decl., Ex. 1) While the memo notes that "the auction rate market has experienced a significant dislocation stemming

21

from the liquidity cris[is]es since June 2007," it recommends that the State of California
"continue in the ARS mode . . . for the time being . . . but review its exposure over the next three
weeks." (Schwartz Decl., Ex. 1 at 1-2) JP Morgan's recommendation that California "stay the
course and monitor how its ARS continue to trade" (id. at 3) does not suggest that it had reached
the conclusion that its own inventory of ARS should be "reduced or sold entirely." Defer, 2010
WL 3452387, at *5. Indeed, the memo suggests that JP Morgan does not expect significant
developments in the ARS market in the short term. In recommending to California that it "stay
the course," JP Morgan states that "[s]hould further ARS market deterioration continue . . . or
should the State's ARS widen substantially or suffer from a failed auction, the State will have
ample time to consider possible alternatives to staying in the ARS mode. . . ." (Id. at 2)

In sum, Lead Plaintiff has not pled facts demonstrating that, at any point in the
Class Period, JPMorgan had reached a decision to dispose of or reduce its ARS inventory.
Plaintiff has merely pled that JPMorgan consistently sold some of the ARS it had purchased
through "support bids," rather than accumulating an unlimited inventory of these securities.
Accordingly, Plaintiff has not pled facts sufficient for this Court to infer that JPMorgan had the
scienter necessary to engage in fraud, either through market manipulation or through
misrepresentations and omissions.

## 2.    Strong Circumstantial Evidence of Conscious Misbehavior

If a complaint does not establish motive and opportunity for fraud, it may
nonetheless "satisfy [the scienter] requirement by alleging facts . . . constituting strong
circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, Inc., 493
F.3d at 99. "To survive dismissal under the 'conscious misbehavior' theory, [plaintiffs] must
show that they alleged reckless conduct by [defendants], which is 'at the least, conduct which is

22

highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" Kalnit, 264 F.3d at 142 (quoting Honeyman v. Hoyt, 220 F.3d 36, 39 (2d Cir. 2000) (internal citation omitted)). "At least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'" ECA, Local 132 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 199 (2d Cir. 2009) (quoting Novak, 216 F.3d at 311).

Lead Plaintiff's arguments concerning this issue mirror his arguments concerning motive and opportunity. Plaintiff relies again on the February 2008 memo to California and his argument that JP Morgan sold off its ARS inventory after becoming aware of the liquidity risks associated with ARS. As discussed above, however, Plaintiff has not pled facts demonstrating that JP Morgan decided to, or did, sell off its ARS inventory in late 2007 and early 2008 because of concerns about the liquidity of ARS. Instead, the facts alleged in the FAC demonstrate that JP Morgan consistently sold ARS inventory throughout the Class Period. Nor – for the reasons discussed above – does the February 2008 memo give rise to a strong inference of conscious misbehavior.

Lead Plaintiff also argues, however, that the FAC alleges that JPMorgan engaged in conscious misbehavior by violating "industry standards." The FAC alleges that (1) JP Morgan did not observe the "best practices" standards issued by the Securities Industry and Financial Markets Association in April 2007, which provide that "[a] Broker-Dealer should disclose, if

23

true, that . . . it routinely places one or more Bids in Auctions generally. . . ."; and (2) JP Morgan

did not comply with Municipal Securities Rulemaking Board ("MSRB") rule G-17, which

imposes on broker-dealers a "duty to give a complete description of [a] security, including

features of the auction process that likely would be considered significant by a reasonable

investor." (FAC ¶¶ 89, 92, 94)  Assuming arguendo that JP Morgan's disclosures did not

comply with these standards, violation of industry standards does not in itself constitute strong

circumstantial evidence of conscious misbehavior or recklessness.  Stevelman v. Alias Research,

Inc., 174 F.3d 79, 84 (2d Cir. 1999) (rejecting plaintiff's argument that defendant's "disregarding

of GAAP and industry standards in its financial reporting is itself strong circumstantial evidence

of conscious misbehavior or recklessness."); see also Chill v. General Electric Co., 101 F.3d 263,

270 (2d Cir. 1996) ("Allegations of a violation of GAAP provisions or SEC regulations, without

corresponding fraudulent intent, are not sufficient to state a securities fraud claim.").  Because

Plaintiff has not pled facts demonstrating "corresponding fraudulent intent," his allegations that

JP Morgan failed to comply with industry standards are insufficient to establish scienter.

### D.     Plaintiff Has Not Pled Misrepresentations and Omissions

As discussed above, Lead Plaintiff's claims for market manipulation and

misrepresentations and omissions fail because he has not pled scienter – a necessary element of

both claims.  His claim sounding in misrepresentations and omissions also fails because he has

not pled with particularity the misrepresentations that form the basis of his claim, nor has he

established that JPMorgan had a duty to disclose such that its "omissions" could give rise to a

claim for fraud.

To satisfy the heightened pleading standard of Rule 9(b) with respect to a claim

for material misrepresentations or omissions, "the complaint must (1) specify the statements that

24

the plaintiff alleges were fraudulent, (2) identify the speaker, (3) indicate when and where the statements were made, and (4) explain why the statements were fraudulent." Miller v. Lazard, Ltd., 473 F. Supp. 2d 571, 580 (S.D.N.Y. 2007). In addition, the PSLRA imposes a "nearly identical" standard. Miller, 473 F. Supp. 2d at 580 n.1.

The FAC fails to identify any misrepresentations with the degree of particularity required under Rule 9(b). Plaintiff's allegations of misrepresentations are vague and conclusory: that JPMorgan made "false and misleading statements"; that "JP Morgan falsely described JPM ARS and the auction rate securities market to investors"; and that "JP Morgan directed its brokers throughout the United States to represent to investors . . . that auction rate securities were highly liquid, short-term, safe investments similar to money market funds." (FAC ¶¶ 39, 56-57) Such generalized statements do not satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA, which require precise identification of the statements alleged to be misrepresentations.

Allegations of omission "will not support a claim of securities fraud unless the defendant has a duty to disclose the information." Tabor v. Bodisen Biotech, Inc., 579 F. Supp. 2d 438, 448 (S.D.N.Y. 2008). Such a duty may arise "when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." Chiarella v. United States, 445 U.S. 222, 228 (1980) (internal citation omitted). Another "circumstance creating a duty to disclose arises when disclosure is necessary to make prior statements not misleading." In re Time Warner, Inc. Sec. Litig., 9 F.3d 259, 268 (2d Cir. 1993).

The FAC does not allege facts demonstrating that either set of circumstances existed here. Plaintiff does not allege that he had any relationship with JPMorgan; he alleges

25

only that he "purchased JPM ARS from TD Ameritrade during the Class Period." (FAC ¶ 11)
To the extent that Lead Plaintiff is attempting to assert claims for other class members who may
have purchased ARS from a JP Morgan broker, a broker's duty is limited to the "narrow task of
consummating the transaction requested," and that duty does not create a fiduciary relationship.
Press v. Chem. Inv. Servs. Corp., 166 F.3d 529, 536 (2d Cir. 1999).

          Lead Plaintiff has likewise not alleged that "disclosure [was] necessary to make
prior statements not misleading." Time Warner, Inc., 9 F.3d at 268. "Once a corporation has
elected to speak . . . Rule 10b-5 mandates that its speech must be truthful, accurate, and
complete. . . .[E]ven an entirely truthful statement may provide a basis for liability if material
omissions related to the content of the statement make it – or other statements made – materially
misleading." In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 159-160
(S.D.N.Y. 2008) (internal citations omitted). An omission is actionable only if it is material,
however – i.e., if there is "a substantial likelihood that the disclosure of the omitted [information]
would have been viewed by the reasonable investor as having significantly altered the 'total mix'
of information available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (internal
citations omitted).

          Lead Plaintiff asserts that JPMorgan's disclosures reflect material omissions
concerning the frequency with which it intervened at ARS auctions. See FAC ¶ 61 (asserting
that JP Morgan's disclosure that it "might" or "may" intervene in auctions suggested "that it did
so sporadically at most"). According to the FAC, JP Morgan "maintain[ed] a policy of
intervening in every auction for which JP Morgan served as the sole or lead auction dealer, to the
extent necessary to prevent the auction from failing, to create the appearance of stability in the
auction rate securities market and to mask the inherent illiquidity of JPM ARS. . . ." (FAC ¶ 39)

The FAC also alleges that "JP Morgan followed a uniform policy of placing support bids, if needed to prevent auction failure." (FAC ¶ 43)  Plaintiff argues that because JPMorgan placed bids in "every auction . . . to the extent necessary to prevent the auction from failing," its disclosure that it did so "routinely" was incomplete and constituted a material omission.

The Second Circuit has rejected this argument.  In Wilson, the Court found that "Merrill's statement that it 'may routinely' place support bids is not inconsistent with the possibility that it would place such bids in every Merrill ARS auction that took place over a particular period."  2011 WL 5515958, at * 11.  The Court further noted that while plaintiff "reads the word 'may' as speaking to the likelihood that Merrill would place support bids, an investor could more easily understand the word as disclosing merely that Merrill was permitted, but not required, to place bids for its own account to prevent an auction from failing."  Id. Moreover, none of the cases cited by Lead Plaintiff support his argument that the use of the word "routinely" constitutes an omission under the circumstances here.  See Hunt v. Alliance N. Am. Gov. Income Trust, Inc., 159 F.3d 723, 728 (2d Cir. 1998) (defendant represented that certain techniques were available to hedge against risks when it knew that such techniques were unavailable); Dolphin & Bradbury, Inc. v. S.E.C., 512 F.3d 634, 640 (D.C. Cir. 2008) (defendant represented that tenant departures were a possibility despite knowledge that largest tenant had plans to leave); In re Prudential Sec. Inc. Ltd. P'ships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (defendant represented that aircraft values could decline despite certainty that they would decline dramatically).  JP Morgan's disclosure that it "routinely" placed support bids made clear that these bids were part of a then-existing policy as opposed to a remote future possibility.

With respect to the period before 2006, Lead Plaintiff has not pled an omissions-based claim with sufficient particularity.  The FAC alleges in general terms that the prospectuses

27

for JP Morgan ARS were misleading. (FAC ¶ 61)  However, the FAC does not allege that JP

Morgan played any role in preparing the prospectuses, and the prospectuses that have been

submitted to the Court do not contain any indication that they were prepared by JP Morgan.

(Youngwood Decl., Ex. C; Schwartz Decl., Ex. 2)

### E.      **Plaintiff Has Not Pled Manipulative Conduct**

Lead Plaintiff has also failed to plead the manipulative conduct necessary for its

claim of market manipulation, at least for the period after JP Morgan's 2006 disclosure.

A plaintiff alleging market manipulation must show "that an alleged manipulator

engaged in market activity aimed at deceiving investors as to how other market participants have

valued a security." ATSI, 493 F.3d at 100.  In other ARS-related litigation in this District, courts

have found disclosures similar to JP Morgan's 2006 disclosure sufficient to preclude a finding of

market manipulation, since disclosure defeats any allegation that a defendant acted with the goal

of deceiving investors. See Wilson, 2011 WL 5515958, at *13 (affirming district court's ruling

that plaintiff had failed to plead "manipulative acts" given defendant's website disclosures); In re

UBS Auction Rate Sec. Litig., No. 08 Civ. 2967(LMM), 2010 WL 2541166, at *18 (S.D.N.Y.

Jun. 10, 2010) (claim for market manipulation fails where "documents disclosed that the ARS

market . . . could be influenced by broker-dealers"); Citigroup, 700 F. Supp. 2d at 307 (no claim

for market manipulation where the defendants had disclosed their ability to "engage in the very

conduct of which Plaintiff complains").

### F.      **Control Person Liability**

Lead Plaintiff also brings a claim against JPMorgan Chase for violations of

Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  A claim for control person liability under

Section 20(a) is "necessarily predicated on a primary violation of securities laws." Rombach,

28

355 F.3d at 177-78. Because the Court finds that Lead Plaintiff has not pled any underlying

violation of securities law, this claim will be dismissed.

## CONCLUSION

Lead Plaintiff's motion to stay (Dkt. No. 38) is denied as moot. Defendants'

motion to dismiss (Dkt. No. 33) is granted. The Clerk of the Court is directed to terminate both

motions.

Dated: New York, New York
       March 31, 2012

SO ORDERED.

Paul G. Gardephe
United States District Judge

29